**SEALED**



## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 22-CR-20156-MOORE

**UNITED STATES OF AMERICA**

**v.**                                                            **UNDER SEAL**

**STERICYCLE, INC.,**

**Defendant.**

_____ /

### DEFERRED PROSECUTION AGREEMENT

Defendant Stericycle, Inc. (the "Company"), pursuant to authority granted by the Company's Board of Directors reflected in Attachment B, and the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), enter into this deferred prosecution agreement (the "Agreement").

### Criminal Information and Acceptance of Responsibility

1.      The Company acknowledges and agrees that the Fraud Section will file the attached two-count criminal Information in the United States District Court for the Southern District of Florida charging the Company with conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is to violate: (1) the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-1; and (2) the books and records provision of the FCPA, as amended, Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff(a).  In so doing, the Company: (a) knowingly waives any right it may have to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b)

1

knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Florida. The Fraud Section agrees to defer prosecution of the Company pursuant to the terms and conditions described below.

2.     The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the attached Statement of Facts, and that the allegations described in the Information and the facts described in the attached Statement of Facts are true and accurate. The Company agrees that, effective as of the date the Company signs this Agreement, in any prosecution that is deferred by this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, in connection therewith, the Company agrees not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines, or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

## Term of the Agreement

3.     This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from the later of the date on which the Information is filed or the date on which the independent compliance monitor (the "Monitor") is retained by the

2

Company, as described in Paragraphs 11-15 below (the "Term"). The Company agrees, however, that, in the event the Fraud Section determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section, in its sole discretion, for up to a total additional time period of one year, without prejudice to the Fraud Section's right to proceed as provided in Paragraphs 18-22 below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the monitorship or compliance reporting obligations described in Attachment D, for an equivalent period. Conversely, in the event the Fraud Section finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the monitorship in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.

### Relevant Considerations

4.    The Fraud Section enters into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

a.    the Company did not receive voluntary disclosure credit pursuant to the FCPA Corporate Enforcement Policy in the Department of Justice Manual 9-47.120, or pursuant to the Sentencing Guidelines, because it did not voluntarily and timely disclose to the Fraud Section the conduct described in the Statement of Facts attached hereto as Attachment A ("Statement of Facts");

b.    the Company received full credit for its cooperation with the Fraud Section's investigation, including: proactively disclosing certain evidence of which the United States was previously unaware; providing information obtained through its internal investigation,

3

which allowed the government to preserve and obtain evidence as part of its own independent investigation; making detailed factual presentations to the Fraud Section; voluntarily facilitating interviews in the United States of foreign-based employees; and collecting and producing voluminous relevant documents to the Fraud Section, including documents located outside the United States, accompanied by translations of documents;

        c.    the Company provided to the Fraud Section all relevant facts known to it, including information about all of the individuals involved in the conduct described in the attached Statement of Facts and conduct disclosed to the Fraud Section prior to the Agreement;

        d.    the Company engaged in extensive remedial measures, including: (i) commencing remedial measures based on internal investigations of the misconduct prior to the commencement of the Government's investigation; (ii) strengthening its corporate governance by appointing numerous new individuals to senior management and Board of Directors positions and establishing a Safety, Operations, and Environmental Committee to enhance Board oversight; (iii) strengthening its compliance organization by hiring additional compliance personnel, including an experienced new Chief Ethics and Compliance Officer who reports directly to Stericycle's Chief Executive Officer and Chair of the Audit Committee of the Board of Directors; (iv) updating its code of conduct, policies, procedures and internal controls relating to, among other things, anti-corruption, retention and management of commercial agents and other third parties, and gifts, travel and entertainment; (v) enhancing its internal reporting, investigations and risk assessment processes; (vi) overhauling its compliance training and communications; (vii) disciplining certain employees involved in the relevant conduct, including terminating certain employees including senior managers; and (viii) divesting its subsidiaries in Mexico and Argentina and taking steps to address its risks in Brazil.

4

e.      the Company has enhanced and has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program) but, despite its extensive remedial measures described above, the Company to date has not fully implemented or tested its enhanced compliance program, and thus the imposition of an independent compliance monitor for a term of two years, as described more fully below and in Attachment D, is necessary to prevent the recurrence of misconduct;

f.      the nature, seriousness, and pervasiveness of the offense conduct, as described in the Statement of Facts, including the Company's involvement in a scheme to pay millions of dollars in bribes to government officials of Brazil, Mexico, and Argentina, as well as the duration of the misconduct;

g.      the Company has some history of prior civil and regulatory settlements, but no prior criminal history; and

h.      the Company's agreement to concurrently resolve an investigation by the U.S. Securities and Exchange Commission ("SEC") relating to the conduct described in the Statement of Facts through a cease-and-desist proceeding, and agreeing to pay $28,184,239 in disgorgement and prejudgment interest; and an additional investigation by authorities in Brazil related to the conduct described in the Statement of Facts, and which the Fraud Section is crediting in connection with the penalty in this Agreement;

j.      the Company has agreed to continue to cooperate with the Fraud Section in any ongoing investigation as described in Paragraph 5 below;

k.      accordingly, after considering (a) through (j) above, the Fraud Section believes that the appropriate resolution in this case is a Deferred Prosecution Agreement with the

Company; a criminal monetary penalty in the amount of $52,500,000 which reflects a discount of 25 percent off the bottom of the otherwise-applicable Sentencing Guidelines fine range; and the imposition of a two-year independent compliance monitor.

## Future Cooperation and Disclosure Requirements

5.     The Company shall cooperate fully with the Fraud Section in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the Fraud Section at any time during the Term until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term.  At the request of the Fraud Section, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Company  or any of its subsidiaries or affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the Fraud Section.  The Company's cooperation pursuant to this Paragraph is subject to applicable law and regulations, including data privacy and national security laws, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company must provide to the Fraud Section a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company bears the burden of establishing the validity of any such an assertion.  The Company agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a.     The Company shall timely and truthfully disclose all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and

former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Fraud Section may inquire.  This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Fraud Section, upon request, any document, record, or other tangible evidence about which the Fraud Section may inquire of the Company.

b.      Upon request of the Fraud Section, the Company shall designate knowledgeable employees, agents, or attorneys to provide to the Fraud Section the information and materials described in Paragraph 5(a) above on behalf of the Company.  It is further understood that the Company must at all times provide complete, truthful, and accurate information.

c.      The Company shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section, present or former officers, directors, employees, agents, and consultants of the Company.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities.  Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

d.      With respect to any information, testimony, documents, records, or other tangible evidence provided to the Fraud Section pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable laws and regulations, to other governmental authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Fraud Section, in its sole discretion, shall deem appropriate.

7

6.      In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegation of conduct that may constitute a violation of the FCPA anti-bribery or accounting provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegation to the Fraud Section.

**Payment of Monetary Penalty**

7.      The Fraud Section and the Company agree that application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following analysis:

a.      The 2018 USSG are applicable to this matter.

b.      <u>Offense Level</u>.  Based upon USSG § 2C1.1, the total offense level is 34, calculated as follows:

| | | |
|---|---|---|
| (a)(2) | Base Offense Level | +12 |
| (b)(1) | Multiple Bribes | +2 |
| (b)(2) | Value of benefit received more than $9,500,000 | +20 |
| **TOTAL** | | 34 |

c.      <u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(1), the base fine is $50,000,000 (the fine indicated in the Offense Level Fine Table)

d.      <u>Culpability Score</u>.  Based upon USSG § 8C2.5, the culpability score is 7, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(2) | the organization had 1,000 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +4 |
| (g)(2) | the organization fully cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its | |

8

|  |  |
|---|---|
| criminal conduct | - 2 |
| **TOTAL** | 7 |

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine | $50,000,000 |
| Multipliers | 1.40(min)/2.80(max) |
| Fine Range | $70,000,000/$140,000,000 |

The Company agrees to pay a total monetary penalty in the amount of $52,500,000 (the "Total Criminal Penalty"). This reflects a 25 percent discount off the bottom of the applicable Sentencing Guidelines fine range. The Company and the Fraud Section agree that the Company will pay the United States Treasury $35,000,000, equal to approximately two-thirds of the Total Criminal Penalty, within ten business days of the execution of this Agreement. The Fraud Section agrees to credit towards satisfaction of payment of the Total Criminal Penalty the amount the Company pays to Brazilian authorities in fines, up to a maximum of $17,500,000, equal to approximately one-third of the Total Criminal Penalty, so long as those payments are pursuant to the Company's separate resolution with Brazilian authorities concerning the same underlying conduct related to Brazil as described in the Statement of Facts. The Company has agreed to resolve investigations by the Controladoria-Geral da União (CGU) and the Advocacia-Geral de União (Attorney General Office) and the Fraud Section agrees to credit approximately $9,300,000 of the $17,500,000 against the amounts the Company pays pursuant to those separate resolutions. In the event that the Company reaches a resolution with a third Brazilian authority, with which the Company and the Fraud Section have been coordinating, the Fraud Section will also credit any remaining amount, up to $8,200,000. In the event the Company does not pay these Brazilian authorities, pursuant to resolutions involving the same underlying conduct, any part of the $17,500,000 within

twelve months of the execution of this Agreement, the Company will be required to pay the full remaining amount to the United States Treasury on or before one year from the date of the agreement.  The Company and the Fraud Section agree that this penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4 of this Agreement.  The Total Criminal Penalty is final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Fraud Section that the Total Criminal Penalty is the maximum penalty that may be imposed in any future prosecution, and the Fraud Section is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Fraud Section agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment.  The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total Criminal Penalty.  The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty or disgorgement amounts that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.

## Conditional Release from Liability

8.     Subject to Paragraphs 18-22, the Fraud Section agrees, except as provided in this Agreement, that it will not bring any criminal or civil case against the Company or any of its direct or indirect affiliates, subsidiaries or joint ventures relating to any of the conduct described in the attached Statement of Facts or the criminal Information filed pursuant to this Agreement.  The Fraud Section, however, may use any information related to the conduct described in the attached Statement of Facts against the Company:  (a) in a prosecution for perjury or obstruction of justice;

10

(b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

      a.    This Agreement does not provide any protection against prosecution of any future conduct by the Company.

      b.    In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

**Corporate Compliance Program**

9.    The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout its operations, including those of its affiliates, subsidiaries, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption, including, but not limited to, the minimum elements set forth in Attachment C.

10.    In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures regarding compliance with the FCPA and other applicable anti-corruption laws. Where necessary and appropriate, the Company agrees to modify its existing compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal

11

accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  The compliance program, including the internal accounting controls system will include, but not be limited to, the minimum elements set forth in Attachment C.  In assessing the company's compliance program, the Fraud Section, in its sole discretion, may consider the Monitor's certification decision.

### **Independent Compliance Monitor**

11.     Promptly after the Fraud Section's selection pursuant to Paragraph 13 below, the Company agrees to retain a Monitor for the term specified in Paragraph 14.  The Monitor's duties and authority, and the obligations of the Company with respect to the Monitor and the Fraud Section, are set forth in Attachment D, which is incorporated by reference into this Agreement.  Within twenty (20) business days after the date of execution of this Agreement, the Company shall submit a written proposal identifying the monitor candidates, and, at a minimum, providing the following:

         a.     a description of each candidate's qualifications and credentials in support of the evaluative considerations and factors listed below;

         b.     a written certification by the Company that it will not employ or be affiliated with the monitor for a period of not less than two years from the date of the termination of the monitorship;

         c.     a written certification by each of the candidates that s/he is not a current or recent (i.e., within the prior two years) employee, agent, or representative of the Company and holds no interest in, and has no relationship with, the Company, its subsidiaries, affiliates or related entities, or its employees, officers, or directors;

d.      a written certification by each of the candidates that s/he has notified any clients that the candidate represents in a matter involving the Criminal Division, Fraud Section (or any other Department component) which is handling the monitor selection process, and that the candidate has either obtained a waiver from those clients or has withdrawn as counsel in the other matter(s); and

e.      a statement identifying the monitor candidate that is the Company's first, second, and third choice to serve as the monitor.

12.    The Monitor candidates or their team members shall have, at a minimum, the following qualifications:

a.      demonstrated expertise with respect to the FCPA and other applicable anti-corruption laws, including experience counseling on FCPA issues;

b.      experience designing and/or reviewing corporate compliance policies, procedures and internal controls, including FCPA and anti-corruption policies, procedures and internal controls;

c.      the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

d.      sufficient independence from the Company to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

13.    The Fraud Section retains the right, in its sole discretion, to choose the Monitor from among the candidates proposed by the Company.  Monitor selections shall be made in keeping with the Department's commitment to diversity and inclusion.  If the Fraud Section determines, in its sole discretion, that any or all of the three candidates lack the requisite qualifications, it shall notify the Company and request that the Company propose another

13

candidate or candidates within twenty (20) business days.  This process shall continue until a Monitor acceptable to both parties is chosen.  The Fraud Section and the Company will use their best efforts to complete the selection process within sixty (60) calendar days of the execution of this Agreement.  The Fraud Section retains the right to determine that the Monitor should be removed if, in the Fraud Section's sole discretion, the Monitor fails to conduct the monitorship effectively, fails to comply with this Agreement, or no longer meets the qualifications outlined in Paragraph 12 above.  If the Monitor resigns, is removed, or is otherwise unable to fulfill his or her obligations as set out herein and in Attachment D, the Company shall within twenty (20) business days recommend a pool of three qualified Monitor candidates from which the Fraud Section will choose a replacement, following the process outlined above.

14.     The Monitor's term shall be two years from the date on which the Monitor is retained by the Company, subject to extension as described in Paragraph 3.  The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachment D.  The Company agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires.  Nor will the Company discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term. Upon agreement by the parties, this prohibition will not apply to other monitorship responsibilities that the Monitor or the Monitor's firm may undertake in connection with related resolutions with foreign or other domestic authorities.

15.     At the end of the monitorship, provided all requirements set forth in Paragraphs 19-20 of Attachment D are met, the Company will be permitted to self-report to the Fraud Section periodically, at no less than six-month intervals, for the remainder of this Agreement, regarding

remediation and implementation of the enhanced compliance measures set forth by the Monitor as described in Paragraph 21 of Attachment D.  The Company shall designate a senior company officer as the person responsible for overseeing the Company's corporate compliance reporting obligations.  During this self-reporting period, the Company shall conduct and prepare at least two follow-up reviews and reports, as described below:

a.      The Company shall undertake follow-up reviews at six-month intervals, each incorporating the Fraud Section's views and comments on the Company's prior reviews and reports, to determine whether the policies and procedures of the Company are reasonably designed to detect and prevent violations of the FCPA and other applicable anticorruption laws.  Reports shall be transmitted to:

> Deputy Chief – FCPA Unit
> Deputy Chief – CECP Unit
> Criminal Division, Fraud Section
> U.S. Department of Justice
> 1400 New York Avenue N.W.
> Bond Building, Eleventh Floor
> Washington, D.C. 20005.

b.      The first self-review and report shall be completed within six months of certification by the Monitor, as described in Paragraph 21 of Attachment D.   The final follow-up review and report shall be completed and delivered to the Fraud Section no later than thirty days before the end of the Term.

c.      The Company may extend the time period for submission of any of the follow-up reports with the prior written approval of the Fraud Section.

### Deferred Prosecution

16.      In consideration of the undertakings agreed to by the Company herein, the Fraud Section agrees that any prosecution of the Company for the conduct set forth in the attached

15

Statement of Facts be and hereby is deferred for the Term. To the extent there is conduct disclosed by the Company that is not set forth in the attached Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

17.     The Fraud Section further agrees that if the Company fully complies with all of its obligations under this Agreement, the Fraud Section will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire. Within six months after the Agreement's expiration, the Fraud Section shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agrees not to file charges in the future against the Company based on the conduct described in this Agreement and the attached Statement of Facts. If, however, the Fraud Section determines during this six-month period that the Company breached the Agreement during the Term, as described in Paragraph 18, the Fraud Section's ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 18 to 20, remains in full effect.

## Breach of the Agreement

18.     If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 9 and 10 of this Agreement and Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (f) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether the Fraud Section

16

becomes aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section has knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Fraud Section in the U.S. District Court for the Southern District of Florida or any other appropriate venue.  Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Fraud Section's sole discretion. Any such prosecution may be premised on information provided by the Company or its personnel. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.  In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

19.     In the event the Fraud Section determines that the Company has breached this Agreement, the Fraud Section agrees to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of

such notice, the Company shall have the opportunity to respond to the Fraud Section in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Fraud Section shall consider in determining whether to pursue prosecution of the Company.

20.      In the event that the Fraud Section determines that the Company has breached this Agreement:  (a) all statements made by or on behalf of the Company to the Fraud Section or to the Court, including the attached Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section.

21.      The Company acknowledges that the Fraud Section has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.   The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

22.     On the date that the period of deferred prosecution specified in this Agreement expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the Fraud Section in the form of executing the document attached as Attachment E to this Agreement that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement.  Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

### Sale, Merger, or Other Change in Corporate Form of Company

23.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations, that is material either to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.  The purchaser or successor in interest must also agree in writing that the Fraud Section's ability to determine a breach under this Agreement is applicable in full force to that entity.  The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void.  The Company shall provide notice to the Fraud Section at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form.  The Fraud Section shall notify the Company prior to such

19

transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement.  At any time during the Term the Company engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section may deem it a breach of this Agreement pursuant to Paragraphs 18-22 of this Agreement.  Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section.

## Public Statements by Company

24.     The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts.  Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 18-22 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section.  If the Fraud Section determines that a public statement by any such person contradicts in whole or in part a statement contained in the attached Statement of Facts, the Fraud Section shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after

notification.  The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the attached Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the attached Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

25.     The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Fraud Section to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Company; and (b) whether the Fraud Section has any objection to the release.

26.     The Fraud Section agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation.  By agreeing to provide this information to such authorities, the Fraud Section is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

### Limitations on Binding Effect of Agreement

27.     This Agreement is binding on the Company and the Fraud Section but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although

the Fraud Section will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.  If the court refuses to grant exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), all the provisions of this Agreement shall be deemed null and void, and the Term shall be deemed to have not begun, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement is signed until the date the Court refuses to grant the exclusion of time plus six months, and except for the provisions contained within Paragraph 2 of this Agreement.

## Notice

28.     Any notice to the Fraud Section under this Agreement shall be given by electronic mail and/or personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, with copies by electronic mail, addressed to the Chief, FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue NW, Washington, DC 20005.  Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, with copies by electronic mail, addressed to Office of the General Counsel, Stericycle, Inc. 2355 Waukegan Road, Bannockburn, IL 60015.  Notice shall be effective upon actual receipt by the Fraud Section or the Company.

## Complete Agreement

29.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the Fraud Section.  No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud Section, the attorneys for the Company and a duly authorized representative of the Company.

22

**AGREED:**

**FOR STERICYCLE, INC.:**

Date: 4/15/22                              By: _____

Kurt M. Rogers, Esq.
~~Executive~~ Vice President, General Counsel
and Corporate Secretary
Stericycle, Inc.


Date: 7/16/22                             By: _____

Timothy J. Treanor
Stephen L. Cohen
Michael D. Mann
Julia Mirabella
Sidley Austin LLP


**FOR THE DEPARTMENT OF JUSTICE:**

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

Date: 4-18-22                             BY: _____

Paul A. Hayden
Jil Simon
Trial Attorneys

23

ATTACHMENT A

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and Stericycle, Inc. ("Stericycle or the "Company"). Certain of the facts herein are based on information obtained from third parties by the United States through its investigation and described to Stericycle. Stericycle hereby agrees and stipulates that the following information is true and accurate. Stericycle admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the United States pursue the prosecution that is deferred by this Agreement, Stericycle agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts took place during the relevant time frame and establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

**Relevant Entities and Individuals**

1.      From in or about and between at least 2011 and 2016, Stericycle was a Delaware corporation headquartered in Lake Forest, Illinois. Stericycle ran an international waste management network, focused primarily on medical waste, industrial waste, maritime waste and document destruction. Stericycle had a class of publicly traded securities that were registered with the United States Securities and Exchange Commission pursuant to Section 12(b) of the Securities Exchange Act of 1934 and were traded on the NASDAQ under the ticker "SRCL." Stericycle was an "issuer," as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-1(a) and 78m(b).

2.      Individuals in Stericycle's Latin America division ("Stericycle LATAM") were responsible for overseeing the operations of Stericycle's subsidiaries in Mexico, Brazil, Argentina, Chile, and Puerto Rico. Beginning at least in or about 2013, Stericycle LATAM leadership and staff were based in Miami, Florida.

3.      "Stericycle LATAM Executive 1," an individual whose identity is known to the Fraud Section and the Company, was a Mexican citizen and resident of Miami, Florida, who worked for Stericycle as an executive at Stericycle LATAM.  Stericycle LATAM Executive 1's business responsibilities included oversight and management of Stericycle LATAM and certain of Stericycle's subsidiaries, including acquisitions, operations, finance, and sales. Throughout the relevant time period, Stericycle LATAM Executive 1's direct reporting line was to Stericycle senior executives.  Stericycle LATAM Executive 1 was an employee and agent of Stericycle, an "issuer," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

4.      Medam S.A. de C.V., together with other affiliated entities (collectively, "Stericycle Mexico"), was a wholly owned subsidiary of Stericycle and headquartered in and around Mexico City, Mexico. Stericycle Mexico was under the direction and control of Stericycle LATAM, and its books, records, and accounts were consolidated into the financial statements of Stericycle. During the relevant time period, Stericycle Mexico and its employees were agents of Stericycle, an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

5.      "Stericycle LATAM Executive 2," an individual whose identity is known to the Fraud Section and the Company, was a Mexican citizen based in Mexico and an executive of Stericycle LATAM whose business responsibilities included, among other things, the management of Stericycle LATAM's finances. Stericycle LATAM Executive 2 was an employee of Stericycle

Mexico and an agent of Stericycle, an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

6.      Stericycle Gestao Ambiental Ltda., together with other affiliated entities (collectively, "Stericycle Brazil"), was a wholly owned subsidiary of Stericycle and headquartered in Recife, Brazil. Stericycle Brazil was under the direction and control of Stericycle LATAM, and its books, records, and accounts were consolidated into the financial statements of Stericycle. During the relevant time period, Stericycle Brazil and its employees were agents of Stericycle, an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

7.      "Stericycle Brazil Executive 1," an individual whose identity is known to the Fraud Section and the Company, was a Brazilian citizen and an executive at Stericycle Brazil whose business responsibilities included oversight and management of Stericycle Brazil. Stericycle Brazil Executive 1 reported to Stericycle LATAM Executive 1 and was an agent of Stericycle, an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

8.      "Stericycle Brazil Executive 2," an individual whose identity is known to the Fraud Section and the Company, was a Brazilian citizen and an executive of Stericycle Brazil whose business responsibilities included work in Stericycle Brazil's clinical waste division. Stericycle Brazil Executive 2 was an agent of Stericycle, an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

9.      "Stericycle Brazil Executive 3," an individual whose identity is known to the Fraud Section and the Company, was a Brazilian citizen and an executive of Stericycle Brazil whose business responsibilities included the management of Stericycle Brazil's finances. Stericycle Brazil Executive 3 was an agent of Stericycle, an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

10.     "Brazil Vendors," entities the identities of which are known to the Fraud Section and the Company, were Brazilian companies with which Stericycle Brazil, in certain instances, entered into sham agreements to provide debt-collection services that were never provided. The Brazil Vendors issued false invoices that Stericycle Brazil used in its books and records to conceal the bribe payments to Brazilian government officials.

11.     "Mexico Vendors," entities the identities of which are known to the Fraud Section and the Company, were Mexican companies with which Stericycle Mexico entered into sham service contracts that were used to generate funds for bribe payments to Mexican government officials.

12.     Habitat Ecologico S.A., together with other affiliated entities (collectively, "Stericycle Argentina"), was a wholly owned subsidiary of Stericycle and headquartered in Buenos Aires, Argentina. Stericycle Argentina was under the direction and control of Stericycle LATAM, and its books, records, and accounts were consolidated into the financial statements of Stericycle. During the relevant time period, Stericycle Argentina and its employees were agents of Stericycle, an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

13.     "Stericycle Argentina Executive 1," an individual whose identity is known to the Fraud Section and the Company, was an Argentinian citizen and an executive at Stericycle Argentina whose business responsibilities included work in the Stericycle Argentina Clinical Division. Stericycle Argentina Executive 1 was an agent of Stericycle, an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

## Overview of the Bribery Scheme

14.     From in or about and between at least 2011 and 2016, Stericycle, through certain of its employees and agents, knowingly and willfully conspired and agreed with others to corruptly

A-4

offer and pay approximately $10.5 million in bribes to, and for the benefit of, foreign officials in Brazil, Mexico, and Argentina in order to obtain and retain business and other advantages for and on behalf of Stericycle. Stericycle earned approximately $21.5 million in profits from the corrupt scheme and through its corruptly obtained and retained government contracts.

15.    Stericycle, through Stericycle LATAM Executive 1 and others, expanded Stericycle LATAM through acquisitions and implemented similar methods of bribe payments in Brazil, Mexico, and Argentina. The co-conspirators made and caused to be made hundreds of bribe payments to foreign officials employed by government agencies and instrumentalities in Brazil, Mexico, and Argentina to obtain and retain business advantages and to direct business to Stericycle. Stericycle LATAM Executive 1 directed a scheme by which employees at Stericycle Brazil, Stericycle Mexico, and Stericycle Argentina made bribe payments, typically in cash, and calculated the amount of the bribes as a percentage of underlying contract payments made by or owing from a government customer. In each of the three jurisdictions, the co-conspirators used spreadsheets to track the bribe payments and used code words and euphemisms to refer to them: "CP" or "commission payment" in Brazil, "IP" or "incentive payment" in Mexico, and "alfajores" or "IP" in Argentina. The co-conspirators also produced false and misleading accounting documents and engaged in fake transactions with third parties to generate and conceal the funds used to make the illicit payments. In carrying out the scheme, certain of Stericycle's LATAM employees and agents utilized means and instrumentalities of interstate commerce, including the use of wires in the Southern District of Florida.

**Bribes Paid in Brazil**

16.    Between in or about 2011 and 2016, Stericycle, through certain employees and agents, knowingly and willfully conspired and agreed with others to corruptly offer and pay bribes

to, and for the benefit of, foreign officials within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A), who were employed by at least 25 local and regional government agencies and instrumentalities in Brazil to secure improper advantages in order to obtain and retain business from the Brazilian government in connection with providing waste management services, as well as to obtain authorization for priority release of payments owed under contracts with government agencies. Stericycle earned at least $13.4 million in profits from corruptly obtained and retained business with the Brazilian government.

17.    The bribe payments were made with the knowledge, authorization, and at the direction of Stericycle LATAM Executive 1 and Stericycle LATAM Executive 2, as well as Stericycle Brazil Executive 1, Stericycle Brazil Executive 2, and Stericycle Brazil Executive 3 and others at Stericycle Brazil. Stericycle LATAM Executive 1 also received spreadsheets containing the bribe payments in hardcopy and by email for review. For example, on or about January 8, 2016, Stericycle Brazil Executive 1 emailed Stericycle LATAM Executive 1 a version of the CP Spreadsheet, stating "[a]s per our conversation, please find attached the spreadsheet detailing the expenses with debt collection services for 2014 and 2015."

18.    Stericycle Executive 1 and Stericycle Brazil Executive 2 directed the distribution of cash to Stericycle Brazil sales employees, who used the cash to make bribe payments—often through third party intermediaries—to government officials in different regions. As part of the scheme, Stericycle Brazil employees agreed upon bribe payments in return for receiving payment priority on certain invoices owed under contracts with government agencies; the bribe payments were typically a percentage of the invoice amount owed or a fixed amount.

19.    Specifically, two employees at Stericycle Brazil (the "Stericycle Brazil finance employees") maintained a list of Stericycle Brazil sales employees who delivered bribe payments

A-6

to government officials associated with particular government customers. The Stericycle Brazil finance employees prepared bank orders in the names of the Stericycle Brazil sales employees, who would retrieve the money from the bank and deliver the cash funds—often through an intermediary—to government officials associated with government customers.

20.     For example, on or about March 30, 2015, after Stericycle Brazil had received payment from a government agency for an outstanding invoice, a Stericycle Brazil sales employee requested approval from Stericycle Brazil Executive 2 to make a bribe payment to a government official associated with that agency.  Stericycle Brazil Executive 2 approved the bribe payment, and a Stericycle Brazil finance employee made the funds available. The Stericycle Brazil sales employee retrieved approximately BRL 44,000 (approximately $13,200)—which represented approximately 20% of the invoice amount paid by the government agency—in cash from a bank and delivered it to a third-party intermediary so the intermediary could deliver at least half of that amount as a bribe to the official.

21.     Stericycle Brazil Executive 1 and Stericycle Brazil Executive 3 directed the Stericycle Brazil finance employees to conceal the bribery scheme in accounting records by making the illicit payments appear as legitimate business expenses. Prior to in or about September 2012, Stericycle Brazil had inflated invoices from vendors that also provided otherwise legitimate services in order to cover bribe payments. Beginning in or about September 2012, Stericycle Brazil Executive 1 and Stericycle Brazil Executive 3 retained the Brazil Vendors for the sole purpose of issuing fake invoices to cover bribe payments. To conceal the true purpose of the payments, the Stericycle Brazil finance employees recorded cash withdrawals as advance payments to the Brazil Vendors for purported debt collection services that were never provided. In exchange for a fee, the Brazil Vendors generated fake invoices to Stericycle Brazil for the sham debt collection services.

22.     For example, on or about September 30, 2014, one of the Stericycle Brazil finance employees emailed one of the Brazil Vendors, stating "[k]indly issue the [Brazil Vendor] invoices following the amounts described below" and providing six different amounts for the requested fake invoices. The following day, on or about October 1, 2014, an employee of the Brazil Vendor replied to the Stericycle Brazil finance employee, attaching the corresponding fake invoices.

23.     At the direction of Stericycle Brazil Executive 1 and Stericycle Brazil Executive 3, the Stericycle Brazil finance employees tracked the bribe payments through the "CP Spreadsheet," which tracked relevant information about each bribe payment, including the region, client, bribe calculation (*i.e.*, percentage of the underlying invoice or fixed amount), revenue generated, amount of the bribe payment, third-party intermediary, and the name of the Stericycle Brazil sales employee responsible for retrieving the cash from the bank and delivering the bribe payment.

24.     For example, on or about July 29, 2014, a Stericycle Brazil finance employee emailed another Stericycle Brazil employee asking for a payment order in the amount of R$107,800.96 (approximately $48,499.65) to be withdrawn from a local bank the following day. The email requesting the payment order referenced one of the Brazil Vendors. The same amount, R$107,800.96, appeared in a July 2014 entry in the CP Spreadsheet.

25.     On or about August 3, 2015, a Stericycle Brazil finance employee emailed two other Stericycle Brazil finance employees with the subject line listing one of the Brazil Vendors. The email cited four separate amounts tied to fake invoices issued by the Brazil Vendor between July 21, 2015, and July 30, 2015, totaling R$138,448.60 (approximately $42,876). The same total amount for July 21, 2015, through July 23, 2015, appeared on the CP Spreadsheet for July 2015, along with the region, the bribe payment amount, and the name of the same Brazil Vendor.

26.     On or about November 23, 2015, Stericycle Brazil Executive 1 emailed the Stericycle Brazil finance employees, authorizing a R$50,000 payment (approximately $13,206), in connection with one of the Brazil Vendors. The same amount, R$50,000, appeared as a November 24, 2015, entry in the CP Spreadsheet along with the name of the same Brazil Vendor.

### Bribes Paid in Mexico

27.     Between in or about 2011 and 2016, Stericycle, through certain of its employees and agents, knowingly and willfully conspired and agreed with others to corruptly offer and pay bribes to, and for the benefit of, foreign officials within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A), who were employed by local and regional government agencies and instrumentalities in Mexico to secure improper advantages in order to obtain and retain business from at least 15 Mexican state-owned entities in connection with providing waste management services, to obtain authorization for or priority release of payments owed under contracts, and to avoid fines. Stericycle earned at least $3.7 million in profits from corruptly obtained and retained contracts with the Mexican government.

28.     The bribe payments were made with the knowledge, authorization, and at the direction of Stericycle LATAM Executive 1 and Stericycle LATAM Executive 2, as well as executives and managers of Stericycle Mexico. Stericycle LATAM Executive 2 and Stericycle Mexico employees approved the distribution of funds to the Mexico Vendors, which purported to provide services to Stericycle Mexico, to make bribe payments to officials employed by state-owned and state-controlled hospitals and other government entities. Bribes were typically paid monthly to these officials and were calculated as a percentage of the customer's invoice value, a percentage of the amount of waste collected, or as a fixed amount. Most of the bribe payments were made in cash  and were referred to in code as "little pieces of chocolates" or "IP payments".

29.     Stericycle LATAM Executive 1 received and reviewed spreadsheets reflecting the bribe payments. For example, on or about January 17, 2013, a Stericycle Mexico employee emailed Stericycle LATAM Executive 1 and Stericycle LATAM Executive 2, attaching a spreadsheet entitled "Invoices IP [] DIC.12" and describing the spreadsheet as a "reference file" that included the "monthly amount summary" and an analysis of the "concepts we use in order to sustain the operation." The attached spreadsheet included references to bribe payments from in or about January through December 2012, along with corresponding Mexico Vendors that would submit fake invoices with descriptions of fabricated services.

30.     Stericycle LATAM Executive 1 and Stericycle LATAM Executive 2 also participated in monthly Mexico Executive Committee sessions during which they reviewed financial records that contained an accounting of the bribe payments. For example, the minutes from the June 2012 and September 2013 Mexico Executive Committee sessions reflected a breakdown of "advanced payments," including "IP" (or "incentive payments") totaling 346,535 pesos (approximately $24,916) and 1,768,866 pesos (approximately $135,495), respectively.

31.     In order to conceal and paper over the bribe payments, Stericycle Mexico employees obtained fake invoices from approximately 45 different Mexico Vendors that provided no legitimate goods or services. The invoices included false descriptions of services that were not, in fact, provided. Many payments to the Mexico Vendors were made prior to or on the same day a corresponding invoice was issued. The Mexico Vendors then passed the money generated through payments on the fake invoices to Stericycle Mexico employees in order to pay bribes and, in some instances, paid the bribes directly.

32.     Stericycle LATAM Executive 2 and Stericycle Mexico employees maintained the "IP Spreadsheets," which tracked each bribe payment as well as pertinent details, including among

A-10

others, the Mexico Vendor providing the fake invoice, the amount of the bribe, the date and method of payment, the Stericycle employee responsible for paying the bribe, method of calculating the bribe payment, the government official receiving the bribe, and the fake description of services noted on the Mexico Vendor invoice.

33.    For example, on or about October 1, 2014, a senior manager at Stericycle Mexico emailed Stericycle LATAM Executive 1, stating "[t]he dinner with [Mexican Official] from [the Mexican social security agency] was postponed for tomorrow, he has been in communication supporting the process of the current contracts and apparently, he is orienting us properly." The IP Spreadsheets showed the same Mexican Official receiving at least one bribe payment per month during most months in 2015, paid by Stericycle LATAM Executive 2.

34.    In or around May 2015, the IP Spreadsheets included 17 bribe payments totaling approximately 1.1 million pesos (approximately $72,050). The IP Spreadsheets showed that 14 of the payments were made in cash by Stericycle LATAM Executive 2 to individuals, including named government officials. The IP Spreadsheets included false entries identifying fake services to justify the payments, such as "forklift rental," "publicity," and "promotional products."

35.    On or around May 4, 2016, Stericycle LATAM Executive 2 and another Stericycle LATAM employee, while in Miami, Florida, discussed the cost to the Company of discontinuing the payment of bribes to foreign officials. Specifically, Stericycle LATAM Executive 2 told the other LATAM employee that Stericycle Mexico would lose significant business if they stopped paying bribes. Stericycle LATAM Executive 2 then prepared a spreadsheet estimating that, in 2016, Stericycle Mexico would lose over 75 million pesos (approximately $4,020,000) in revenue if Stericycle "eliminat[ed] everything."

### Bribes Paid in Argentina

36.     In or about and between 2011 and 2016, Stericycle, through certain of its employees and agents, knowingly and willfully conspired and agreed with others to corruptly offer and pay bribes to, and for the benefit of, foreign officials, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A), in Argentina to secure improper advantages in order to obtain and retain business in connection with providing waste management services and to obtain authorization or priority release of payments owed under those contracts. Stericycle earned at least $4.4 million in profits from corruptly obtained and retained contracts with the Argentinian government.

37.     The bribe payments to Argentinian government officials were made with the knowledge, authorization, and at the direction of Stericycle LATAM Executive 1 and Stericycle LATAM Executive 2, as well as Stericycle Argentina Executive 1 and other local managers ("Stericycle Argentina Country Management"). For example, on or about January 11, 2011, Stericycle LATAM Executive 2 emailed Stericycle LATAM Executive 1 providing a spreadsheet of the "Top 20 SG&A [(Selling, General, and Administrative)] expenses by country." In the email, Stericycle LATAM Executive 2 wrote that the spreadsheet included comparisons of the SG&A numbers with and without "IP," and broke down the amounts of these "incentive payments" by jurisdiction, including Mexico, Brazil, and Argentina.

38.     Stericycle Argentina Country Management calculated and approved bribe payments, which were typically paid in cash by Stericycle Argentina sales employees. For example, on occasions when a bribe needed to be paid, a Stericycle Argentina sales employee emailed an estimate of the bribe payment, which was typically a percentage of the underlying contract payment. Upon approval of the payment, the Stericycle Argentina sales employee

obtained cash from the Stericycle Argentina office in Buenos Aires and subsequently delivered the bribe payment to the foreign official.

39.     For example, on or about September 27, 2012, two Stericycle Argentina sales employees emailed about a bribe to an Argentinian official. The bribe represented 10% of the underlying contract payment from a regional health ministry for waste collection services, totaling 213,000 pesos (approximately $45,610). On or about September 28, 2012, one of the Stericycle Argentina sales employees delivered the bribe payment in the amount of 21,300 pesos (approximately $4,560), in cash, to the Argentinian official.

40.     Stericycle Argentina employees used the words "alfa" and "alfajores" (a traditional cookie popular in Argentina) as codes to refer to the bribe payments. For example, on or about May 30, 2013, two Stericycle Argentina sales employees exchanged an email regarding outstanding payments from an Argentinian regional health ministry, writing, "I should tell you that when I talked about this issue, they reminded me that the alfajores from the last payment are outstanding, which is why I promised that if they give us the checks on Monday the 17 or Tuesday the 18 I would be bringing that plus the checks."

41.     On or about September 2, 2013, one of the Stericycle Argentina sales employees emailed his colleague a message with the subject "Alfa [] from the Last Payment of $257,730 Canceled on the 30th of August." The email includes a breakdown of a contract payment of 257,730 pesos (approximately $45,034), which after deducting taxes was 213,000 pesos (approximately $37,218) and a 15% "alfa," or bribe payment, totaling 31,950 pesos (approximately $5,583).

42.     On or about December 1, 2014, one of the Stericycle Argentina sales employees wrote from a personal email address to the personal email addresses of Stericycle Argentina

Executive 1 and another Stericycle Argentina colleague regarding outstanding balances owed by a regional health ministry, stating, "I also want to remind you that we still owe the alfas for all of the last settlement, having this up to date helps a lot when it is time to apply pressure."

43.      Stericycle Argentina Executive 1 also maintained financial records that tracked payments and included references to "alfa" and "IP Commissions" (the same code word used in connection with bribes paid by Stericycle in Mexico).

**False Books and Records**

44.      In connection with the scheme detailed above to pay bribes to foreign officials in Brazil, Mexico, and Argentina, and in order to conceal the corrupt payments, between at least in or about 2012 and 2016, Stericycle, acting through its employees and agents, knowingly and willfully conspired and agreed with others to maintain false books, records, and accounts that did not accurately and fairly reflect the transactions and dispositions of its assets. Specifically, Stericycle falsely recorded bribe payments as legitimate expenses such as purported debt collection expenses, first aid training, and other false services, and maintained falsified Sarbanes-Oxley certifications, including knowingly false certifications signed by Stericycle LATAM Executive 1, in its consolidated books, records, and accounts.

45.      For example, from in or about 2012 through the first quarter in 2016, including on or about December 31, 2014, December 31, 2015, and March 31, 2016, Stericycle LATAM Executive 1 signed quarterly Sarbanes-Oxley certifications that falsely stated, in sum and substance, that Stericycle LATAM Executive 1 was not aware of any material event or potential material event — defined to include a "violation or alleged violation of any applicable law or regulation" — in the Stericycle LATAM business during the relevant period. These certifications failed to disclose, among other things, the bribe payments to various foreign officials in Brazil,

Mexico, and Argentina, and the existence of false books, records, and accounts related to the concealment of those payments.

ATTACHMENT B

## CERTIFICATE OF CORPORATE RESOLUTIONS – STERICYCLE, INC.

WHEREAS, Stericycle, Inc. (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") regarding issues arising in relation to certain improper payments to foreign officials to obtain and retain business for the Company; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Fraud Section; and

WHEREAS, the Company's General Counsel, Kurt M. Rogers, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the provisions of the U.S. Sentencing Guidelines, and the consequences of entering into such agreement with the Fraud Section;

Therefore, the Board of Directors has RESOLVED that:

1. The Company (a) acknowledges the filing of the two-count Information charging the Company with violation of Title 18, United States Code, Section 371, that is, to violate: (1) the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1; and (2) the books and records provisions of the FCPA, as amended, Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff(a); (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Fraud Section; and (c) agrees to accept a monetary penalty against the Company totaling $52,500,000 and to pay such penalty to the United States Treasury with respect to the conduct described in the Information;

2.     The Company accepts the terms and conditions of this Agreement, including, but not limited to: (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Florida; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.     The General Counsel of the Company, Kurt M. Rogers, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the General Counsel of the Company, Kurt M. Rogers, may approve;

4.     The General Counsel of the Company, Kurt M. Rogers, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.     All of the actions of the General Counsel of the Company, Kurt M. Rogers, which actions would have been authorized by the foregoing resolutions except that such actions were

B-2

taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved,

and adopted as actions on behalf of the Company.

Date: 4/15/22

By: _____

Corporate Secretary
Stericycle, Inc.

B-3

**ATTACHMENT C**

**CORPORATE COMPLIANCE PROGRAM**

In order to address any deficiencies in their internal controls, compliance codes, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.*, 15 U.S.C. § 78m(b)(5) and other applicable anti-corruption laws, Stericycle, Inc. (the "Company"), on behalf of itself and its subsidiaries and affiliates, agrees to continue to conduct, in a manner consistent with all of their obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its existing compliance programs, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Companies' existing internal controls, compliance codes, policies, and procedures:

*Commitment to Compliance*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policies against violations of the anti-corruption laws and its compliance codes, and demonstrate rigorous adherence by example.  The Company will also ensure that middle management, in turn, reinforce those standards and

encourage employees to abide by them.  The Company will create and foster a culture of ethics and compliance with the law in their day-to-day operations at all levels of the Company.

*Policies and Procedures*

2.     The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts (collectively, the "anti-corruption laws"), which policy shall be memorialized in a written compliance code.

3.     The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance codes, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company.  These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including, but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Company.  Such policies and procedures shall address:

      a.     gifts;

      b.     hospitality, entertainment, and expenses;

      c.     customer travel;

     d.     political contributions;

     e.     charitable donations and sponsorships;

     f.     facilitation payments; and

     g.     solicitation and extortion.

4.     The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts.  This system shall be designed to provide reasonable assurances that:

     a.     transactions are executed in accordance with management's general or specific authorization;

     b.     transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

     c.     access to assets is permitted only in accordance with management's general or specific authorization; and

     d.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

5.     The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors

C-3

of operation, potential clients and business partners, use of third parties, gifts, travel and entertainment expenses, charitable and political donations, involvement in joint venture arrangements, importance of licenses and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

6.      The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

7.      The Company will assign responsibility to one or more senior corporate executives of the Companies for the implementation and oversight of the Company's anti-corruption compliance codes, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8.      The Company will implement mechanisms designed to ensure that its anti-corruption compliance codes, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales,

C-4

legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements. The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

9.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance codes, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

10.      The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's anti-corruption compliance codes, policies, and procedures.

11.      The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance codes, policies, and procedures. The Company will handle the investigations of such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

*Enforcement and Discipline*

12.     The Company will implement mechanisms designed to effectively enforce its compliance codes, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's anti-corruption compliance codes, policies, and procedures by the Company's directors, officers, and employees.   Such procedures should be applied consistently, fairly and in a manner commensurate with the violation, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance codes, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Relationships*

14.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

        a.      properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

C-6

b.       informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's anti-corruption compliance codes, policies, and procedures; and

c.       seeking a reciprocal commitment from agents and business partners.  The Company will understand and record the business rationale for using a third party in a transaction, and will conduct adequate due diligence with respect to the risks posed by a third-party partner such as a third-party partner's reputations and relationships, if any, with foreign officials.  The Company will ensure that contract terms with third parties specifically describe the services to be performed, that the third party is actually performing the described work, and that its compensation is commensurate with the work being provided in that industry and geographical region.  The Company will engage in ongoing monitoring of third-party relationships through updated due diligence, training, audits, and/or annual compliance certifications by the third party.

15.    Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include: (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books, records, and accounts of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's compliance codes, policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

16.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conducts appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

17.     The Company will ensure that the Company's compliance codes, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

        a.      train the directors, officers, employees, agents, and business partners consistent with Paragraphs 8 and 9 above on the anti-corruption laws and the Company's compliance codes, policies, and procedures regarding anti-corruption laws; and

        b.      where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring, Testing, and Remediation*

18.     In order to ensure that its compliance program does not become stale, the Company will conduct periodic reviews and testing of its anti-corruption compliance codes, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's anti-corruption codes, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.   The Company will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions.   Based on such review and testing and their analysis of

C-8

any prior misconduct, the Company will conduct a thoughtful root cause analysis and timely and appropriately remediate to address the root causes.

ATTACHMENT D

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of Stericycle, Inc. (the "Company"), on behalf of itself and its subsidiaries and affiliates, with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), are as described below:

1.      The Company will retain the Monitor for a period of not less than 24 months (the "Term of the Monitorship"), unless the early termination provision of Paragraph 3 of the Deferred Prosecution Agreement (the "Agreement") is triggered.  Subject to certain conditions specified below that would, in the sole discretion of the Fraud Section, allow for an extension of the Term of the Monitorship, the Monitor shall be retained until the criteria in Paragraphs 19-20 below are satisfied or the Agreement expires, whichever occurs first.

*Monitor's Mandate*

2.      The Monitor's primary responsibility is to assess and monitor the Company's compliance with the terms of the Agreement, including the Corporate Compliance Program in Attachment C, to specifically address and reduce the risk of any recurrence of the Company's misconduct.  During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the internal accounting controls, record-keeping, and financial reporting policies and procedures of the Company as they relate to the Company's current and ongoing compliance with the FCPA and other applicable anti-corruption laws (collectively, the "anti-corruption laws") and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate").  This Mandate shall include an assessment of the

D-1

Board of Directors' and senior management's commitment to, and effective implementation of, the corporate compliance program described in Attachment C of the Agreement.

*Company's Obligations*

3.      The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's compliance program in accordance with the principles set forth herein and subject to applicable law, including applicable data protection and labor laws and regulations.  To that end, the Company shall: facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 5-6; and provide guidance on applicable local law (such as relevant data protection and labor laws).  The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement.  The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third-party vendors, agents, and consultants.

4.      Any disclosure by the Company to the Monitor concerning corrupt payments, false books and records, and internal accounting control failures shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Fraud Section, pursuant to the Agreement.

*Withholding Access*

5.      The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor.  In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the

Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.      If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Fraud Section.  Such notice shall include a general description of the nature of the information, documents, records, facilities or current or former employees that are being withheld, as well as the legal basis for withholding access.  The Fraud Section may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the
Company and Review Methodology*

7.      In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis.  The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (*e.g.*, legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.      The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets.  In carrying out the Mandate, the Monitor should consider, for instance, corruption risks presented by: (a) the countries and industries in which the Company operates; (b) current and

future business opportunities and transactions; (c) current and potential business partners, including third parties and joint ventures, and the business rationale for such relationships; (d) the Company's gifts, travel, and entertainment interactions with foreign officials; and (e) the Company's involvement with foreign officials, including the amount of foreign government regulation and oversight of the Company, such as licensing and permitting, and the Company's exposure to customs and immigration issues in conducting its business affairs.

9.      In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things:  (a) inspection of relevant documents, including the Company's current anti-corruption policies and procedures; (b) on-site observation of selected systems and procedures of the Company at sample sites, including internal accounting controls, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

10.      To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial ("first") review and prepare a first report, followed by at least one follow-up ("second") review and report as described in Paragraphs 16-18 below.  With respect to the first report, after consultation with the Company and the Fraud Section, the Monitor shall prepare the first written work plan within thirty (30) calendar days of being retained, and the Company and the Fraud Section shall provide comments within fifteen (15) calendar days after receipt of the written work plan.  With respect to each follow-up report, after consultation with the Company and the Fraud Section, the Monitor shall prepare a written work plan at least thirty (30) calendar

days prior to commencing a review, and the Company and the Fraud Section shall provide comments within fifteen (15) calendar days after receipt of the written work plan. Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Fraud Section in its sole discretion.

11.    All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement. In developing such understanding, the Monitor is to rely to the extent possible on available information and documents provided by the Company. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*First Review*

12.    The first review shall commence no later than sixty (60) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the Fraud Section). The Monitor shall issue a written report within one hundred twenty calendar days of commencing the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with the anti-corruption laws. The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Company and the Fraud

Section prior to finalizing them.  The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures, and practices. Rather, the reports should focus on areas the Monitor has identified as requiring recommendations for improvement or which the Monitor otherwise concludes merit particular attention.  The Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit copies to:

> Deputy Chief – FCPA Unit
> Deputy Chief – CECP Unit
> Criminal Division, Fraud Section
> U.S. Department of Justice
> 1400 New York Avenue N.W.
> Bond Building, Eleventh Floor
> Washington, D.C. 20005

After consultation with the Company, the Monitor may extend the time period for issuance of the first report for a brief period of time with prior written approval of the Fraud Section.

13.     Within one hundred and twenty (120) calendar days after receiving the Monitor's first report, the Company shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days of receiving the report, the Company notifies in writing the Monitor and the Fraud Section of any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable.  With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred and twenty (120) calendar days of receiving the report but shall propose in writing to the Monitor and the Fraud Section an alternative policy, procedure, or system designed to achieve the same objective or purpose.  As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt

in good faith to reach an agreement within fifteen calendar days after the Company serves the written notice.

14.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Fraud Section.  The Fraud Section may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement.  Pending such determination, the Company shall not be required to implement any contested recommendation(s).

15.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred and twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section.

*Follow-Up Review(s)*

16.     The second review shall commence no later than one hundred and twenty (120) calendar days after the issuance of the initial report (unless otherwise agreed by the Company, the Monitor, and the Fraud Section).  The Monitor shall issue a written  report within one hundred twenty (120) calendar days of commencing the second review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the first review.  The Monitor shall also certify whether the Company's compliance program, including its policies, procedures, and internal controls, is reasonably designed and implemented to prevent and detect violations of the anti-corruption laws. After consultation with the Company, the Monitor may extend the time period for issuance of the second report for a brief period of time with prior written approval of the Fraud Section.

D-7

17.     Within one hundred and twenty (120) calendar days after receiving the Monitor's second report, the Company shall adopt and implement all recommendations in the report.  If the Company considers any recommendations unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable, it must notify the Monitor and the Fraud Section of any such recommendations in writing within thirty (30) calendar days after receiving the report.  The Company need not adopt those recommendations within the one hundred and twenty (120) calendar days of receiving the report but shall propose in writing to the Monitor and the Fraud Section an alternative policy, procedure, or system designed to achieve the same objective or purpose.  As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

18.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Fraud Section.  The Fraud Section may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement.  Pending such determination, the Company shall not be required to implement any contested recommendation(s).

19.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section.

*Certification of Compliance*
*and Termination of the Monitorship*

20.     At the conclusion of the one hundred and twenty (120) calendar day period following the issuance of the second report, if the Monitor believes that the Company's compliance program is reasonably designed and implemented to detect and prevent violations of the anti-corruption laws and is functioning effectively, the Monitor shall certify the Company's compliance with its compliance obligations under the Agreement.  The Monitor shall then submit to the Fraud Section a written report ("Certification Report") within sixty (60) calendar days.  The Certification Report shall set forth an overview of the Company's remediation efforts to date, including the implementation status of the Monitor's recommendations, and an assessment of the sustainability of the Company's remediation efforts.  The Certification Report should also recommend the scope of the Company's future self-reporting.  Also, at the conclusion of the one hundred and twenty (120) calendar day period following the issuance of the second report, the Company shall certify in writing to the Fraud Section, with a copy to the Monitor, that the Company has adopted and implemented all of the Monitor's recommendations in the reports, or the agreed-upon alternatives. The Monitor or the Company may extend the time period for issuance of the Certification Report or the Company's certification, respectively, with prior written approval of the Fraud Section.

21.     At such time as the Fraud Section approves the Certification Report and the Company's certification, the monitorship shall be terminated, and the Company will be permitted to self-report to the Fraud Section for the remainder of the Term of the Agreement, as described in Paragraph 21.  The Fraud Section reserves the right to terminate the monitorship absent certification by the Monitor, upon a showing by the Company that termination is, nevertheless, in the interests of justice.

D-9

22.     If permitted to self-report to the Fraud Section, the Company shall thereafter conduct a self-review of its compliance program and report to the Fraud Section as follows:

(a) within thirty (30) calendar days of the certification, after consultation with the Fraud Section, the Company shall submit a written workplan identifying with reasonable specificity the activities the Company plans to undertake to review and test the effectiveness of its compliance program. The Fraud Section shall provide comments within fifteen (15) calendar days after receipt of the written work plan.  The same process shall be followed regarding each follow-up review and self-report.  Any disputes between the Company and the Fraud Section with respect to any written work plan shall be decided by the Fraud Section in its sole discretion.

(b) within six months of certification, and every six months thereafter until the completion of the Term, or 30 days before completion of the Term if it does not correspond to a six month period, the Company shall submit to the Fraud Section a written report setting forth: the results of the Company's review of its Compliance program, a complete description of its remediation efforts to date, its proposals to improve the Company's internal accounting controls, policies, and procedures for ensuring compliance with the anti-corruption laws, and the proposed scope of the subsequent reviews.  The report shall be transmitted to:

> Deputy Chief – FCPA Unit
> Deputy Chief – CECP Unit
> Criminal Division, Fraud Section
> U.S. Department of Justice
> 1400 New York Avenue N.W.
> Bond Building, Eleventh Floor
> Washington, D.C. 20005

The final review and report shall be completed and delivered to the Fraud Section no later than thirty days before the end of the Term.  The Company may extend the time period for issuance of the self-report with prior written approval of the Fraud Section.

D-10

*Extension of the Term of the Monitorship*

23.     If, however, at the conclusion of the one hundred and twenty (120) calendar-day period following the issuance of the second report, the Fraud Section concludes that the Company has not by that time successfully satisfied its compliance obligations under the Agreement, the Term of the Monitorship shall be extended for one year.

24.     Under such circumstances, the Monitor shall commence the second follow-up ("third") review no later than sixty (60) calendar days after the Fraud Section concludes that the Company has not successfully satisfied its compliance obligations under the Agreement (unless otherwise agreed by the Company, the Monitor, and the Fraud Section).  The Monitor shall issue a written report within one hundred twenty (120) calendar days of commencing the third review in the same fashion as set forth in Paragraph 12 with respect to the first review and in accordance with the procedures for follow-up reports set forth in Paragraphs 16-18.  A determination to terminate the monitorship shall then be made in accordance with Paragraphs 19-20.

25.     If, after completing the third review, the Fraud Section again concludes that the Company has not successfully satisfied its obligations under the Agreement with respect to the Monitor's Mandate, the Term of the Monitorship shall be extended until expiration of the Agreement, and the Monitor shall commence a third follow-up ("fourth") review within sixty (60) calendar days after the Fraud Section concludes that the Company has not successfully satisfied its compliance obligations under the Agreement (unless otherwise agreed by the Company, the Monitor, and the Fraud Section).  The Monitor shall issue a written report within one hundred twenty (120) calendar days of commencing the fourth review in the same fashion as set forth in Paragraph 12 with respect to the first review and in accordance with the procedures for follow-up reports set forth in Paragraphs 16-18.

*Monitor's Discovery of Potential or Actual Misconduct*

26.   (a)   Except as set forth below in sub-paragraphs (b) and (c), should the Monitor discover during the course of his or her engagement that:

- improper payments or anything else of value may have been offered, promised, made, or authorized by any entity or person within the Company or any entity or person working, directly or indirectly, for or on behalf of the Company;

- the Company may have maintained false books, records or accounts; or,

- the Company may have failed to implement a system of internal accounting controls that is sufficient to accurately record the Company's transactions

(collectively, "Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Company's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed. The Monitor also may report Potential Misconduct to the Fraud Section at any time, and shall report Potential Misconduct to the Fraud Section when it requests the information.

(b)   In some instances, the Monitor should immediately report Potential Misconduct directly to the Fraud Section and the Office, and not to the Company. The presence of any of the following militates in favor of reporting Potential Misconduct directly to the Fraud Section and the Office, and not to the Company, namely, where the Potential Misconduct: (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)   If the Monitor believes that any Potential Misconduct actually occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall

D-12

immediately report the Actual Misconduct to the Fraud Section.  Then, after consultation with the Fraud Section, the Monitor shall disclose the Actual Misconduct to the General Counsel, Chief Ethics and Compliance Officer, and/or the Audit Committee of the Company.

(d)     The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Fraud Section or not.  Further, if the Company or any entity or person working directly or indirectly on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Fraud Section and address the Company's failure to disclose the necessary information in his or her reports.

(e)     The Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

27.     The Monitor shall meet with the Fraud Section within thirty calendar days after providing each report to the Fraud Section to discuss the report, to be followed by a meeting between the Fraud Section, the Monitor, and the Company.

28.     At least annually, and more frequently if appropriate, representatives from the Company and the Fraud Section will meet to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Fraud Section, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

29.     The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or

impede pending or potential government investigations and thus undermine the objectives of the monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section determines in its sole discretion that disclosure would be in furtherance of the Fraud Section's discharge of its duties and responsibilities or is otherwise required by law.

**ATTACHMENT E**

**CERTIFICATION – STERICYCLE, INC.**

To:     United States Department of Justice
        Criminal Division, Fraud Section
        Attention: Chief, FCPA Unit

        Re:     Deferred Prosecution Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 18 of the Deferred Prosecution Agreement ("DPA") filed on _____, 2022, in the U.S. District Court for the Southern District of Florida, by and between the Fraud Section and Stericycle, Inc. (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph 6 of the DPA and that the Company has disclosed to the Fraud Section any and all evidence or allegations of conduct required pursuant to Paragraph 6 of the DPA, which includes evidence or allegations that may constitute a violation of the FCPA anti-bribery provisions had the conduct occurred within the jurisdiction of the United States ("Disclosable Information"). This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes. The undersigned further acknowledge and agree that the reporting requirement contained in Paragraph 6 and the representations contained in this certification constitute a significant and important component of the DPA and the Fraud Section's determination whether the Company has satisfied its obligations under the DPA.

The undersigned hereby certify respectively that s/he is the Chief Executive Officer ("CEO") of the Company and that s/he is the Chief Financial Officer ("CFO") of the Company and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Southern District of Florida. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of Florida.


By:     _____          Dated: _____
        [NAME]
        CEO
        Stericycle, Inc.


E-1

By: _____          Dated: _____
     [NAME]
     CFO
     Stericycle Inc.